# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00170-CR

**Sergio Hernandez, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT NO. D-1-DC-07-904087, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Sergio Hernandez was tried on a three-count indictment accusing him of capital murder of a child, felony murder in the course of committing injury to a child, and knowingly causing serious bodily injury to a child. *See* Tex. Penal Code Ann. § 19.02(b)(3) (West 2003), §§ 19.03(a)(8), 22.04(a)(1) (West Supp. 2009). A jury found appellant not guilty of capital murder but convicted him on the two other counts. The district court assessed punishment for both offenses at thirty-eight years' imprisonment. Appellant contends that the evidence is factually insufficient to support the guilty verdicts and that his convictions for both offenses constituted double jeopardy. He further contends that the trial court erred by failing to suppress his statements to the police, by refusing to permit him to impeach a State witness, by overruling his request for an instruction on the lesser offense of criminally negligent homicide, and by authorizing a felony murder conviction based on a misdemeanor. Finally, appellant contends that he was denied due process because the State

failed to disclose material evidence. We overrule these contentions and affirm the judgments of conviction.

**BACKGROUND**

In December 2003, appellant, who was then seventeen years old, was living with Teresita Diaz, eighteen years old, and her two-year-old daughter, Lluvia Diaz, in an Austin apartment. Appellant was not Lluvia's father, but he and Diaz had been living together for about six months and they both considered him to be the child's step-father.

At 4:25 a.m. on December 3, 2003, appellant and Diaz brought Lluvia to the emergency room at St. David's Hospital. Dr. Pamela Ashley, the attending physician, testified that the child had no pulse and was unresponsive. The child's temperature was unusually high, 108 degrees, and there was dry vomit near her nose and mouth. Efforts to revive Lluvia were unsuccessful, and she was pronounced dead at 4:55 a.m. Ashley testified that appellant and Diaz reported that the child had been ill for several days, with a fever and vomiting. Given this reported history, the high temperature, and the absence of any visible injuries, Ashley suspected that Lluvia may have had meningitis.

According to the protocol followed whenever a child dies suddenly, the hospital reported Lluvia's death to the medical examiner and the police. Homicide detective Rogelio Sanchez was dispatched to the hospital. Sanchez testified that he had no reason to suspect foul play, but the police investigate all sudden child deaths. Sanchez spoke to appellant and Diaz at the hospital and asked them to come with him to the police station to give statements. They agreed to do so.

2

Appellant's statement began at approximately 8:00 a.m. and lasted forty-five minutes. Appellant told Sanchez that he was employed as a construction worker and had left for work at 5:00 a.m. the previous day, December 2. He returned home at 4:00 p.m. Diaz had taken Lluvia to see a nutritionist that afternoon, and they arrived home after he did. Using a borrowed car because the battery in his car was dead, appellant then drove Diaz to Round Rock, where she worked on the night cleaning crew at Dell. Lluvia went with them in the car, and she fell asleep in her car seat on the way home. Appellant and the child got home at about 7:00 p.m. Appellant changed Lluvia's diaper and put her to bed, where she cried a bit. Appellant went to bed at about 9:00 p.m. Diaz returned home from work at about 3:30 a.m., and she woke appellant to tell him that something seemed to be wrong with Lluvia. Appellant initially resisted Diaz's suggestion that they take Lluvia to the emergency room, recalling that they had been told previously to use the emergency room only if the child was seriously ill. When Diaz persisted, appellant went to his friend's apartment to see if he could borrow his car again. The friend would not loan the car, but said that appellant could use it to jump start his own car. Appellant told Sanchez that neither he nor Diaz ever thought to call 911. Appellant also said that the child had been complaining of chest and stomach pains during the previous weeks, had been eating irregularly, and had vomited the previous Saturday.

The details of Diaz's statement to Sanchez are not in the record. At trial, Diaz testified that she met appellant while they were both working nights at Dell, and they soon got an apartment together. Appellant changed jobs about two weeks prior to Lluvia's death, which allowed him to watch her at night while Diaz worked. Diaz testified that she awoke on the morning of December 2 after appellant left for work. That afternoon, she took Lluvia by bus to the People's Clinic, where she had an appointment with the dietician. The appointment had been arranged by her

3

pediatrician, who also worked at the People's Clinic, because Lluvia was overweight. Diaz testified that Lluvia appeared to be in good health that afternoon, a fact that was confirmed by the dietician, Susan Jastrow. Jastrow testified that the child's behavior during the thirty-minute consultation was normal for a two-year-old. Jastrow said that she did not notice any external injuries to the child. Lluvia's pediatrician, Dr. Lewis Appel, testified that the child had been in good health during her two-year well-child check on November 17, 2003, and that his only concern had been her weight.

Diaz testified that after she and Lluvia returned home that afternoon, appellant drove her to work at Dell. Diaz said that she got a ride home with a coworker at about 4:00 a.m. As was her custom, she went straight to Lluvia's bedroom to give her a kiss. This night, the child did not stir when kissed, and Diaz noticed that she felt hot. Alarmed, Diaz tried to wake her daughter, but she did not respond. When Diaz tried to sit Lluvia up, the child was limp and appeared to have no strength. Diaz woke appellant and told him that Lluvia needed to go to the hospital. She testified that appellant told her that the child was just asleep and nothing was wrong. Diaz then got Lluvia from her bed and showed her to appellant, and she urged him to go to a neighbor's house to call an ambulance.[1] Appellant got angry and told Diaz that they would take Lluvia to the hospital in the car. Appellant then left the apartment to arrange for transportation. Lluvia periodically stopped breathing while Diaz waited for appellant to start his car, and she continued to do so on the way to the hospital. Diaz testified that the last time this happened, just before they arrived at the emergency room, Lluvia's breathing did not resume.

---

[1] Appellant and Diaz had no phone.

4

Diaz testified that she did not recall telling the emergency room staff that Lluvia had been sick during the previous week. Diaz said that, in fact, Lluvia had been in good health and had had no falls or accidents that might have injured her. A neighbor at the apartment complex, Cristina Martinez Ledesma, testified that she saw Lluvia the day before she died and that she did not appear to be sick.

Appellant and Diaz left the police station after giving their statements to Sanchez. At 11:00 a.m., Sanchez attended the autopsy. The medical examiner, Dr. Elizabeth Peacock, told Sanchez that Lluvia had suffered craniocerebral trauma, that the injuries had been inflicted within the last twelve hours of her life, and that she considered the child's death to be a homicide. Sanchez testified that the police then "went into a murder investigation mode" and a second detective, Kerry Scanlon, was assigned to the case. It was agreed that Scanlon would reinterview Diaz, while Sanchez would conduct a second interview of appellant.

Sanchez found appellant at his brother's house. Appellant agreed to go with Sanchez to the police station for another interview. This interview began at 2:45 p.m. on December 3 and lasted about five hours. Although Sanchez did not consider appellant to be in custody, he advised him of his rights before questioning him. During this statement, appellant largely repeated what he had told Sanchez earlier.

While questioning appellant the second time, Sanchez noticed that appellant's right hand appeared to be swollen. Sanchez considered this to be significant because Peacock had told him that the pattern of Lluvia's injuries was consistent with her having been hit with a fist. When Sanchez asked appellant about his fist, appellant first said that he had hurt it while at work. Later, he said that he had punched the fender of a car earlier that day. During a break, Sanchez contacted

5

appellant's brother-in-law, who appellant said had witnessed the incident. The brother-in-law did not confirm the story. After conferring with Sanchez, Scanlon confirmed with Peacock that the bruising found in Lluvia's scalp had a pattern that resembled a fist. Peacock also told Scanlon that the child's tongue had bite marks. Peacock said that it was possible that Lluvia bit her tongue when her head was injured.

Scanlon also spoke to Diaz and searched the apartment. Diaz told Scanlon that appellant had a bad temper, and that he hit things when he was angry. Diaz found the clothes that Lluvia had been wearing the day before in a laundry hamper. They were damp as if they had been washed, while the other clothing in the hamper was dry. Diaz said that she had never known appellant to wash clothes. The sheets and pillowcase on the child's bed had what appeared to be blood stains. Diaz told Scanlon that the stains had not been there when she left for work the night before. Tests later confirmed the presence of blood on the sheets, pillowcase, and a blanket. DNA testing of the blood on the pillowcase, and of other blood found on the child's white blouse and pink shirt, showed that the blood was Lluvia's.

Peacock testified that after the scalp was reflected during the autopsy, she observed a "cluster of contusions" on the crown of the skull. When the top of the skull was removed to expose the brain, she found "extensive left subdural hemorrhage." Peacock stated that most of the hemorrhaging appeared to be fresh, but she also found areas of healing—evidenced by the presence of "histiocytes and some fibroblastic-type activity"—that indicated an older injury. She concluded that there had been two injuries to the brain. "The vast majority of the hemorrhage, both subdural in the eyes and in the brain itself was all fresh. The only evidence of the older injury was probably 5 percent or less of the subdural." Peacock estimated that the older injury was at least three weeks

6

old and had not contributed to the child's death. The newer, dominant injury "was fresh within 12 hours" and caused her death. Peacock testified that she also found damage to the hypothalamus, a portion of the brain that regulates body temperature. This, she said, would account for the 108 degree temperature. Peacock testified that the bruises she observed reminded her of a fist, but could have been made by some other blunt object.

Peacock stated that Lluvia died as a result of craniocerebral trauma after striking or being struck with a blunt object. She testified that the force required exceeded any reasonable discipline and that the risk of serious injury would have been obvious. Peacock testified that the symptoms of the injury would have manifested themselves almost immediately, and the child would have lapsed into unconsciousness within twenty minutes to perhaps two hours.

## FACTUAL SUFFICIENCY

Appellant does not deny that the evidence summarized above is legally sufficient to sustain the jury's verdicts convicting him of murder in the course of committing injury to a child and injury to a child. He contends, however, that the evidence is factually insufficient to sustain the guilty verdicts. As in any challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference must be

accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson*, 23 S.W.3d at 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

Appellant argues that his conviction rests on Peacock's testimony that the fatal injury to Lluvia's brain was caused by a blow to the head, probably with a fist, that occurred no more than twelve hours before her death, a time when she was alone with appellant. Appellant contends that other evidence, including other expert medical testimony, contradicts Peacock's conclusions regarding both the timing and the cause of the fatal injury. Appellant asserts that the guilty verdicts are manifestly wrong because the overwhelming weight of the evidence supports the conclusion that Lluvia died as a result of an injury or injuries inflicted days before her death.

Appellant relies in part on the testimony of his aunt by marriage, Veronica Arrendondo, who lived at the same apartment complex as appellant and Diaz. Arrendondo testified that she saw Lluvia fall on the stairs outside her apartment, striking her head on one of the concrete steps, a week before she died. Arrendondo further testified that Lluvia had fallen down the stairs inside Arrendondo's apartment two days before she died, and that she had often seen Lluvia strike her head on a table while playing. Arrendondo said that Diaz and Lluvia came to her apartment on the afternoon of December 2 after they returned from the People's Clinic, and that Lluvia did not seem to be well, she "couldn't open her eyes well." Appellant asserts that Lluvia's death was the

8

result of these earlier accidental blows to her head, and he urges that the testimony of other medical experts supports this contention.

The principal expert witness for the defense was Dr. Mark Shuman, an associate medical examiner for Miami-Dade County, Florida. Shuman reviewed Peacock's autopsy report, together with the photographs and histology slides. He also reviewed the police reports and Lluvia's medical records. Shuman agreed with Peacock's conclusion that the cause of death was blunt brain injury. Shuman also testified that while some of the blood in the subdural hematoma appeared to be fresh, there were also inflammatory cells and histiocytes in the hematoma that were evidence of an older injury. Shuman testified that the presence of fresh hemorrhaging did not in itself support Peacock's conclusion that there had been a blow to the head within twelve hours of death. Shuman testified that it was impossible to determine whether the child had suffered two distinct blows to the head, as Peacock concluded, or a single injury days before her death that had continued to bleed. In this connection, Shuman cited scholarly research suggesting that a person can receive a head injury resulting in a subdural hematoma but remain lucid and behave normally for several days while the brain slowly bleeds and swells, ultimately resulting in death. Shuman also testified that he found nothing distinctive in the pattern of the injuries that would suggest the instrumentality by which they were inflicted.

Shuman testified that a blow to the top of the head could result in a contrecoup injury—an injury opposite the side of the impact—to the hypothalamus. He added that such injuries most often occur "when the head strikes something rather than when the head gets struck by something." Although Shuman agreed that an injury to the hypothalamus would account for Lluvia's elevated temperature, he said that he saw no evidence of injury to the hypothalamus in the autopsy

9

photographs. Shuman testified that he could not discount the possibility that the elevated temperature was due to an infection.

The defense also called Dr. David Dolinak, the chief medical examiner for Travis County. Dolinak did not participate in the autopsy, but he reviewed the same records that had been made available to Shuman. Like the other pathologists, Dolinak testified that Lluvia died as a result of blunt force trauma to the brain. He also agreed that there was evidence of both older and more recent hemorrhage, and he agreed with Shuman that it can be difficult to determine in such circumstances whether the fresh bleeding was the result of a new blow to the head or simply renewed bleeding in an older hematoma. During cross-examination, however, Dolinak testified that it would be "pretty unusual" for a hematoma to continue to bleed for days or weeks. Dolinak also testified that there is a difference of opinion among the experts "as to how common it might be for an infant or young child to have a period of lucidity after a head injury that proves to be fatal." Dolinak believed that such instances were rare. Unlike Shuman, Dolinak did see evidence of injury to the hypothalamus. Dolinak testified that given the protected position of the hypothalamus at the base of the brain, a blow capable of damaging it would result in unconsciousness within minutes. Dolinak added that it was "hard to believe" that a child could continue to act normally after such a severe injury.

Dr. James Lukefahr, a pediatrician on the faculty at the University of Texas Medical School in San Antonio, was called by the State as a rebuttal witness. Lukefahr teaches child abuse pediatrics and directs a clinic for neglected and abused children. Like the other experts, Lukefahr believed that Lluvia died as a result of blunt force trauma to the brain. Lukefahr testified that in his opinion, no single blow could have produced an injury of the shape and severity shown by the

10

autopsy records. Instead, "it was either multiple blows by a blunt object or multiple blows by a fist." With regard to the possibility that Lluvia had experienced a lucid interval of perhaps several days following the ultimately fatal injury, Lukefahr testified, "My opinion is that she wouldn't have, because her brain was diffusely injured, and she would really not have had a normal level of consciousness after her injury."

Contrary to appellant's contention, the other medical experts did not contradict Peacock's conclusion that the fatal blow to Lluvia's head was inflicted, with a fist or other blunt object, within twelve hours of death. Even Shuman, the expert most favorable to the defense, testified only that it was possible that the fatal injury had occurred as the result of a fall days before the child's death. Both Dolinak and Lukefahr discounted that possibility, testifying that it was unlikely, if not impossible, that Lluvia could have appeared normal and healthy for days after suffering the brain injury that ultimately took her life. Furthermore, appellant's alternative hypothesis rests on the testimony of his aunt, Arrendondo, who was the only witness to Lluvia's alleged falls during the week preceding her death. The jury could have reasonably discounted Arrendondo's testimony in light of her family relationship with appellant and her admitted failure to have brought this information to the attention of the authorities prior to trial. The jury could also credit the testimony of the witnesses, including the dietician at the People's Clinic, who testified that Lluvia appeared to be healthy and uninjured on the day preceding her death. Considering all the evidence in a neutral light, we hold that the State's evidence is not so weak as to make the jury's verdicts convicting appellant of murder and injury to a child clearly wrong or manifestly unjust. We further hold that the verdicts are not against the great weight and preponderance of the available evidence. Point of error one is overruled.

11

**DOUBLE JEOPARDY**

Appellant contends that his convictions for both murder and injury to a child constitute multiple punishments for the same offense. A defendant suffers multiple punishments in violation of the Double Jeopardy Clause only when he is convicted of more offenses than the legislature intended. *Ex parte Ervin*, 991 S.W.2d 804, 807 (Tex. Crim. App. 1999). Penal code section 22.04(h) authorizes multiple punishments when a defendant's conduct violates both section 22.04 and another penal code section, even if the two statutes proscribe the "same" conduct. Tex. Penal Code Ann. § 22.04(h); *see Jimenez v. State*, 240 S.W.3d 384, 417-18 (Tex. App.—Austin 2007, pet. ref'd) (affirming convictions for felony murder and injury to child); *Johnson v. State*, 208 S.W.3d 478, 510-11 (Tex. App.—Austin 2006, pet. ref'd) (affirming convictions for capital murder and injury to elderly person). It is the legislative authorization of multiple punishments found in section 22.04(h) that distinguishes this case from *Littrell v. State*, on which appellant relies. 271 S.W.3d 273, 278-79 (Tex. Crim. App. 2008) (holding that convictions for felony murder and aggravated robbery constituted double jeopardy). Appellant's eighth point of error is overruled.

**FAILURE TO DISCLOSE MATERIAL EVIDENCE**

As previously mentioned, the medical experts agreed that a portion of the subdural hematoma showed signs of aging and healing, thus suggesting that Lluvia had sustained an injury to her brain days before her death. Appellant asserts that the autopsy report "describes only a single injury to the child's head, and at no time prior to trial was the defense notified that the [medical examiner] would be pursuing any other basis or time for that injury." Appellant states that Peacock's testimony that there had been an older injury "came as a complete surprise to defense counsel."

Appellant contends that the failure to disclose prior to trial Peacock's finding of two separate injuries violated the State's constitutional obligation to disclose material evidence favorable to the defense. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). This due process duty to disclose requires the prosecution to disclose exculpatory and impeachment evidence that is material to either guilt or punishment. *Harm*, 183 S.W.3d at 406.

The record does not support appellant's contention that the autopsy report contained no mention of an older injury, nor does it support appellant's assertion in his brief that the report was "changed" by the medical examiner. The "microscopics" section of the autopsy report stated that "[s]ections of the dura show mature hemorrhage with infiltrate of acute inflammatory cells and histiocytes." It was the presence of these inflammatory cells and histiocytes in a portion of the subdural hematoma, mentioned in the report and shown in the histology slides, that led the medical witnesses to agree that at least some of the observed injury to Lluvia's brain had occurred days before her death.[2] Appellant does not deny that the autopsy report and histology slides were made available to the defense prior to trial. Insofar as the presence of the inflammatory cells and histiocytes was exculpatory or impeachment evidence, *Brady* and its progeny were satisfied.

Appellant's complaint appears to be that he was not told before trial that Peacock would testify that there were two injuries, a mature one that did not contribute to Lluvia's death and a recent one that caused her death. We infer that appellant's trial counsel had anticipated that Peacock would testify that there was only one injury to Lluvia's brain, and that counsel had planned

---

[2] The clearest explanation was provided by Dr. Dolinak, who testified that histiocytes are a special form of cell used by the body to "eat up the red blood cells" in a hematoma. The presence of histiocytes and related cells are evidence that a hematoma "has been there for at least a few days, probably longer."

13

to use the evidence of mature hemorrhage to show that the injury had been inflicted days before death and at a time when persons other than appellant had custody of the child. But a defendant has no general due process right to advance notice of inculpatory evidence that the State intends to use at trial. *Hall v. State*, 283 S.W.3d 137, 163 (Tex. App.—Austin 2009, pet. ref'd) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559-61 (1977)). Peacock's failure to testify as counsel had anticipated did not, on this record, violate appellant's due process rights. Point of error five is overruled.

## ADMISSION OF STATEMENTS

Appellant brings forward two points of error urging that the trial court erred by overruling his motion to suppress his two videotaped statements to Sanchez. It will be recalled that Sanchez first questioned appellant at 8:00 a.m. on December 3, three hours after Lluvia was pronounced dead. Appellant was not advised of his rights at this interview, which lasted forty-five minutes. Sanchez questioned appellant a second time at 2:45 p.m. that same day, after the medical examiner determined that the death was a homicide. Appellant was advised of his rights at the start of this interview, which lasted about five hours. In point of error two, appellant contends that Sanchez engaged in the "question first, warn later" tactic condemned in *Missouri v. Seibert*, 542 U.S. 600 (2004). In point of error three, appellant urges that Sanchez failed to adequately advise him at the time of the second interview that he could still invoke his right to remain silent despite having made the earlier statement.

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). This means that the ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory.

14

*Id.* The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give the trial court almost complete deference in determining historical facts, but we review de novo the trial court's application of the law to those facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

Appellant filed a pretrial motion to suppress evidence, including "video and/or audio tapes . . . produced in violation of the procedures set out in" the United States and Texas constitutions and the code of criminal procedure. A hearing on the motion was held on April 9, 2007, and Sanchez was the only witness. Sanchez testified, as he later testified at trial, that he was initially told that Lluvia had died of acute meningitis. Sanchez said that he told appellant and Diaz at the hospital that he "wanted to interview them to get a statement, basically, from both of them concerning the events prior to the child's death." Sanchez testified that both appellant and Diaz agreed to make a statement, that they went to the police station voluntarily, and that neither of them was under arrest. We have already summarized the contents of appellant's first statement. Sanchez testified that after taking this statement, he had no reason to be suspicious about the cause of Lluvia's death. Later that day, however, after learning of the medical examiner's findings and conclusions, Sanchez sought out appellant for further questioning. Sanchez testified that appellant agreed to return to the police station and went there voluntarily. He was not handcuffed or under arrest. Although Sanchez did not consider appellant to be in custody, he advised him of his rights as prescribed by *Miranda* and article 38.22. *See Miranda v. Arizona*, 384 U.S. 436 (1966); Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a) (West 2005). As appellant notes in his brief, the second interview was "more adversarial and repetitive but contains virtually identical questions and substantially

15

similar answers" as the first. Sanchez testified that he did not consider appellant to be in custody until, near the end of the interview, he learned that an arrest warrant had been issued and he told appellant that he was under arrest.

Appellant's principal argument at the suppression hearing was that he did not understand his rights as they were explained by Sanchez, and therefore he did not knowingly and voluntarily waive those rights before giving the second statement. The court took the matter under advisement and asked the parties to "file some law" speaking to whether appellant was in custody and whether he knowingly waived his rights. Defense counsel filed a trial brief urging that appellant was in custody at the time of the second statement, that he was not adequately advised of this rights, and that the waiver of rights was not knowing and voluntary. The court later filed a written order overruling the motion to suppress. The order states that "the question of custody is irrelevant since the defendant was properly warned and knowingly and intelligently waived his rights and voluntarily provided a statement to the officer."

In *Seibert*, the Supreme Court summarized the issue and its holding as follows:

> This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda* . . . , the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible.

542 U.S. at 604 (citation omitted). Among the factors the Court considered in determining that the "midstream" warnings were not sufficient to effectively comply with *Miranda* were the completeness

16

and detail of the first, unwarned statement, the overlapping content of the two statements, the timing and setting of the two statements, the continuity of police personnel, and the degree to which the interrogator treated the second round of questioning as a continuation of the first. *Id*. at 615.[3]

In his points of error, appellant contends that Sanchez engaged in the two-step, "question first, warn later" interrogation technique at issue in *Seibert*. He further contends that, for the reasons discussed in *Seibert*, the *Miranda* warnings he received before he made his second statement were not adequate to ensure that he knowingly and voluntarily waived his Fifth Amendment rights. These contentions fail because appellant has never contended, either in his arguments at the suppression hearing, in his trial brief, or in his brief to this Court, that he was in custody when he made his first statement to Sanchez.[4] Because the uncontradicted evidence supports a finding that appellant was not in custody during the first interview, Sanchez's failure to advise him of his rights at that interview did not violate *Miranda* or article 38.22. *See Miranda*, 384 U.S. at 444-45; Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2, 3. Because there was no violation of

---

[3] Justice Kennedy, who was the critical fifth vote in *Seibert*, stressed in a concurring opinion that the interrogating officer had deliberately violated *Miranda* when he took the first statement, and he said that different considerations would apply if the *Miranda* violation had been inadvertent. *Missouri v. Seibert*, 542 U.S. 600, 620-21 (2004). The court of criminal appeals has adopted Justice Kennedy's concurring opinion and held that *Seibert* applies only when the police deliberately employ the "question first, warn later" technique to circumvent *Miranda*. *Carter v. State*, No. PD-0606-09, 2010 Tex. Crim. App. LEXIS 101, at *17 (Tex. Crim. App. Mar. 24, 2010). When the initial *Miranda* violation is inadvertent rather than deliberate, a second statement given after the required warnings is admissible if the post-warning statement was voluntarily made. *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring) (citing *Oregon v. Elstad*, 470 U.S. 298 (1985)); *Carter*, 2010 Tex. Crim. App. LEXIS 101, at *29.

[4] Although appellant contends that his first statement should have been suppressed, his brief contains no argument pertinent to this contention.

*Miranda* or article 38.22 when appellant gave his first statement, there was no need for Sanchez to take "curative" measures beyond advising appellant of his rights to ensure that appellant's Fifth Amendment rights were fully protected when he made his second statement.

The trial court found that appellant "was properly warned and knowingly and intelligently waived his rights and voluntarily provided a statement to the officer." The record supports this finding. Points of error two and three are overruled.

## IMPEACHMENT

Appellant contends that the trial court erred by refusing to allow him to impeach Diaz with evidence that she had used a false name to receive government health-care benefits. Appellant urges that using a fictitious name to receive government benefits is a crime of moral turpitude and therefore admissible for impeachment under rule 609. Tex. R. Evid. 609(a).

Appellant's reliance on rule 609(a) is misplaced because that rule permits impeachment by evidence of a criminal conviction. Appellant did not claim or show that Diaz had been convicted of any crime arising out of the alleged conduct. Appellant urges no other basis for the disallowed impeachment. Point of error four is overruled.

## LESSER INCLUDED OFFENSE

Appellant contends that the trial court erred by refusing to instruct the jury on the lesser included offense of criminally negligent homicide. *See* Tex. Penal Code Ann. § 19.05 (West 2003). The indictment contained three counts accusing appellant of capital murder, felony murder, and injury to a child, and all three counts were submitted to the jury. As to each count, we must determine whether criminally negligent homicide was included within the offense alleged in the

indictment. *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). The second step in the analysis is to determine whether there was evidence that would permit the jury to rationally find that appellant, if guilty at all, was guilty only of the lesser included offense. *Id*. at 536; *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993).

Criminally negligent homicide is a lesser included offense of capital murder. *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000). However, because appellant was acquitted on the capital murder count, we need not decide if the evidence raised an issue as to whether appellant was guilty only of the lesser included offense. An instruction on criminally negligent homicide would have given the jury an opportunity to convict appellant of the lesser offense rather than acquitting him of capital murder. As to count one, any error in refusing the lesser included offense instruction was clearly harmless. *See* Tex. R. App. P. 44.2(b).

Using the "cognate-pleadings" analysis adopted by the court of criminal appeals, we conclude that criminally negligent homicide was not a lesser included offense of the felony murder alleged in count two. *See Hall*, 225 S.W.3d at 535-36. To convict appellant on this count, the State had to prove that: (1) appellant caused Lluvia's death by striking her with his fist or a blunt object, (2) striking the child in this way was an act clearly dangerous to human life, and (3) this clearly dangerous act was committed in the course of or in furtherance of appellant's commission or attempt to commit felony injury to a child by intentionally, knowingly, or recklessly causing bodily injury to the child by striking her with his hand or a blunt object. Penal code section 19.03(b)(3), which defines the offense of felony murder, plainly dispenses with a culpable mental state. *Lomax v. State*, 233 S.W.3d 302, 305 (Tex. Crim. App. 2007). Thus, the State was not required to prove appellant's culpable mental state with regard to either (1) the child's death or (2) the act clearly dangerous to

19

human life. *See id*. at 307 & n.16. Penal code section 19.05, on the other hand, requires proof that the defendant caused the deceased's death by criminal negligence. For this reason, criminally negligent homicide could not be proved by the same or less than the facts required to prove the alleged felony murder. *See* Tex. Code Crim. Proc. Ann. art. 37.09(1) (West 2006).

Similarly, criminally negligent homicide was not included within the injury to a child offense alleged in count three. To convict appellant on this count, the State was required to prove that he knowingly caused serious bodily injury to a child fourteen years of age or younger by striking her with his hand or a blunt object. Criminally negligent homicide requires proof of a fact, the child's death, that cannot be established by proof of the same or less than the facts required to prove the commission of felony injury to a child.

The trial court did not err by refusing to authorize appellant's conviction for criminally negligent homicide as a lesser included offense of felony murder and injury to a child. Any error in refusing to authorize appellant's conviction for criminally negligent homicide as a lesser included offense of capital murder was harmless. Point of error six is overruled.

**MISDEMEANOR MURDER**

Finally, appellant contends that the trial court's charge erroneously permitted the jury to convict him of felony murder based on an underlying misdemeanor offense. In pertinent part, the charge authorized appellant's conviction for felony murder if the jury found that he caused Lluvia's death in the course of committing "the felony offense of injury to a child, by then and there intentionally or knowingly causing bodily injury to Lluvia Diaz, a child fourteen years of age or

20

younger."[5]  Intentionally or knowingly causing bodily injury to a child is, and was in 2003, a third degree felony.  Tex. Penal Code Ann. § 22.04(f) (West Supp. 2009).  Thus, contrary to appellant's contention, the trial court did not authorize his conviction for felony murder based on an underlying misdemeanor offense.  Point of error seven is overruled.

The judgments of conviction are affirmed.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   April 23, 2010

Do Not Publish

---

[5] The application paragraph did not strictly track the indictment, which alleged in count two that appellant caused Lluvia's death in the course of committing or attempting to commit "the felony offense of Injury to a Child, by then and there intentionally and knowingly and recklessly causing bodily injury to Lluvia Diaz, a child fourteen years of age or younger."  Recklessly causing bodily injury to a child is and was a state jail felony.  Tex. Penal Code Ann. § 22.04(f) (West Supp. 2009).